Good morning, your honors. My name is Jack Tucholsky. I represent ICARE, which is a small community-based NGO in rural Montana. At council table is my co-counsel, Emily Wilmot, and I would like to reserve two minutes of time for rebuttal. Today I'm going to touch upon prudential standing and then try to address a couple of the NEPA issues in this case. Yeah, just for my own part, I would appreciate your jumping to the merits and not so much for the standing question, which doesn't at least trouble me. I don't know about my colleagues. I'm not troubled. Okay, thank you. So head right to the merits. Okay, good. So our primary argument, I think, is that the environmental assessment left out viable alternatives, and that's the standard in this circuit. And in Western Watershed v. Abbey, a case cited by FAA, it says the existence of a viable but unexamined alternative renders an EA inadequate. There's an initial determination before you even get to that of what is the scope of the project, and it's only with respect to an appropriate scope of project that alternatives have to be examined. That's correct. So in view of the fact that the larger planes were sort of bumping up against the maximum for a shorter runway and the idea that air traffic would increase and not decrease over time, why was it an unreasonable scope of project to determine that the longer runway was appropriate? First of all, Your Honor, in the statement of purpose and need, it does not say we have to build a 5,200-foot runway. It just says we have to build an adequate runway. And four years earlier, this is what the FAA said about the existing runway in the 2010 EA. It said, quote, these improvements provide for runway taxi separation and runway length for the type of aircraft using this airport and forecast to use this airport during the next 20 years. And that's an RER at 226. And so in 2010, they say the existing runway of 4,200 feet is fine for the next 20 years. But forecasts are only predictions. And it was a few years later that they're looking at new information and determining that they want something that meets all the standards for a B-2 facility 100 percent of the time and a margin for future growth in larger airplanes. So what is unreasonable or improper about that change of scope at a later time? Because if you look at the 2010 EA, and this is an RER at 219 and 220, it says that when they approved this airport improvement, safety improvements, but left the runway at 4,200 feet, that was based upon an estimated 750 to 950 B-2 aircraft. And so it was when they made that decision, there were twice as many of these B-2 aircraft, but they didn't feel that they had an obligation to create a 5,200-foot runway at that time. Well, obligation is one thing, but it's more a question of appropriate exercise of discretion. They don't have to be obliged, do they, to make a permissible decision? No, we certainly can't, and nor can the court tell them what airport to decide to build. But if I could go back to my premise about alternatives, if you take a look at figure 1.5 in the environmental assessment, it shows a picture of the runway and my client's neighborhood bumping up against this expanded runway, literally at its doorstep. And the fact that in 2010 they were perfectly willing to approve a project that did not lengthen the runway, and also under their own guidance, and this is in the defendant's brief at page 37, a 4,800-foot runway would have met their own policy requirements. But wasn't that a two-phase project? Wasn't that anticipated to be a two-phase project? Yes and no. In the EA, they said, we will consider a second phase. That would have lengthened the runway. But it was not a two-phase project. And they said in that EA that if they went back to lengthen the runway, they would do new NEPA and a new decision. So they did not approve a two-phase project. They discussed the alternatives. It seemed like each of the alternatives considered talked about this phase two to accommodate 100% of these aircraft. So you're saying now, well, they talked about it, but there still would have been a new environmental assessment or a full environmental impact statement? The document says in the decision notice that they agree to do additional NEPA process and make a new decision before they approve phase two. And that's the distinction. And they did do a new process. That's the process we're looking at now. But this is not phase two, Your Honor. This was an entirely – Well, they looked at more, but just the fact that they did more work rather than less doesn't seem to be fatal, does it? I mean, why is that an abuse of discretion to look at more? Well, the standard is whether or not, you know, the decision they ultimately made was arbitrary and capricious, whether it was based on a consideration of the relevant factors. And what has never occurred is a side-by-side comparison of not expanding the runway or only expanding it 4,800 feet rather than the full 5,200 feet to look at the amount of land that's being taken and the amount of wetlands that are being taken, the increased noise and air pollution that comes by building a jet port in someone's neighborhood. And that side-by-side comparison is what NEPA requires. And that's why the standard in this circuit repeatedly has been, if there's a viable but unexamined alternative, then the EA is not valid. And that's my position. I am not asking the court to say, you know, you can't build a 5,200-foot runway. But it's – I mean, the alternatives are the heart of the NEPA process. And without that side-by-side comparison of the impacts, neither the public, the FAA, or in this case, the county government that has to give its blessing to the project as well, has all of the information to make an informed decision. Could I ask a question that's been bothering me? You spoke a minute ago about, in response to Judge Graber's questions, about the volume of traffic. Yes. But I was persuaded and thought it very notable that the Forest Service tanker planes couldn't land on the shorter runway, at least not if they were going to be served at capacity. And, of course, we have other cases where folks have very vividly illustrated the very severe forest fires that happened in this area. So why – given that fact alone, I'm straining to see an abuse of discretion here. Even if the volume was questionable, just this capacity issue for that size aircraft seems to me to be very compelling. And the Forest Service's chief air tanker base, one of three in the country, is located in Missoula, Montana, about 20 air miles away. And so there's – the EA does make that statement that they would like to land there, but there's no evidence in the record that the primary retardant-dropping planes, which are 737s and this runway is not suitable for those, that there was any hindrance of their ability to operate on the forest fires. Is your response that they didn't need this runway to operate their fire-retardant planes? That's right. They're not based in Hamilton, Montana. They're based in Missoula, Montana. Can you help me out with a record site? Where do I find that in our record? It's not in the record, Your Honor. There is one or two sentences that says the Forest Service would appreciate a longer runway, but there's not a lengthy discussion about how their operations fighting fires have specifically been impaired by the shorter runway. The only reference I was referring to, the only one that I've seen, but I want to invite you to point one out if I'm missing it, is the one that said they can't operate those tankers at capacity out of this airstrip. Is there anything else in the record I should be seeing? Not that I'm aware of. Thank you. So, Your Honor, and again, we're not asking for a paper exercise here. I appreciate that that comes up in NEPA cases. But, again, if you look at Figure 1.5 and you see that with the existing runway, excuse me, with the planned expansion of the runway, it bumps right up into a residential neighborhood. And, you know, that leads to another NEPA issue that is important to my clients, and that is the fact that the EA, the government, did not address potential impacts to property values. Well, could I ask you about that? Because their response, of course, is that they did, that they didn't look at every property value study, but they looked at some. I'd like to hear why you think what they looked at was inadequate. Okay, there's nothing in the EA proper about property values, and there's no appendix, there's no study, there's no evaluation. What I saw in the record, in their citation to the record, is a brief two- or three-few-sentence response in response to comments. And so my clients provided seven, six or seven studies in the comment period. They actively participated and said, would you please look at these? And in response to comments, they said they didn't have to, but there's no evaluation of impacts on property values in the EA itself, and there's no evaluation in any of the numerous appendices. And to the FAA's credit, they did respond to some issues, like we raised air quality, and they have a 120-page appendix. So it's not that they aren't aware and they can't respond on the record, but it's not in there for property values. And, you know, again, this issue, when you look at what's going to happen, if you're building a jet port in a residential area, you are going to add noise and air pollution and change the aesthetics of the area, and that, in turn, is going to – it will affect property values. It's important. And the other thing that the government said, with virtually no explanation, is that, okay, there's been property residential areas here for 50 years, as long as this airport's been in here, so the airport doesn't affect property values. And that's, frankly, ludicrous because it's a 4,200-foot runway. It's a small rural airport, and that's why people live out there, because there haven't been – And so to say that because homes have moved out there without any quantitative evidence, without any expert review or discussion, is not a basis for saying, and therefore we're not going to look at property values. So, Your Honor, I see I have about two minutes and 30 seconds left. If you want to save the remainder of the time, you may do that. And I'd like to save it for rebuttal. Thank you. TECLA HANSEN-YOUNG Good morning, Your Honors. May it please the Court, my name is Tecla Hansen-Young, and I represent the FAA. This Court should deny the petition for review because, as is demonstrated in the administrative record, FAA thoroughly evaluated the concerns that have been identified by the petitioners here. As to FAA's discussion of its purpose and need, FAA's project here, its authorization, was driven in large part by the county's proposal. And what the county proposed was the construction of a 5,200-foot-long runway. It's perfectly acceptable for an agency to respond to a project proponent's proposal as part of its purpose and need, and that approach has been affirmed as reasonable in Citizens Against Burlington, a D.C. Circuit case that's discussed in our brief. Here, FAA also identified its statutory goals to provide safe and efficient runway operations. And as was noted earlier, one crucial factor in approving the project was the need to lengthen the runway to enable more efficient operations by, for example, Forest Service firefighting aircraft. What's noted in the record at SCR 935 and 36 are the two incident reports that were filed by two aircraft in 2011 that were not even filled to capacity, which, for these types of aircraft, when they take off from this airport, they can only operate at 85 percent capacity. So that means that they're carrying 15 percent less flame retardant than they would otherwise be able to do if the runway was 5,200 feet long. So they were already operating at less than full capacity, and they had to release more flame retardant in order to safely take off. Also at SCR 771 to 75 is a discussion from the Forest Service that explains why it operates at this airport and why it wanted the longer runway, why that would be better for the agency and for firefighting operations. In addition, longer runways provides higher safety margins, especially when pilots are operating under less than optimal conditions, and, again, more efficient operations. So aircraft can carry more passengers, more fuel, more cargo, such as fire retardant. In addition, the longer runway here would allow larger aircraft, which this airport sees some of, and that is medium-sized aircraft between 12,500 pounds and 60,000 pounds, to operate at this airport. And a major difference between the 2010 EA and this project at issue here is that the county and FAA both decided that it would be fiscally advantageous to go forward with this project in one go and lengthen the runway at the same time that it was moving and widening the width between the taxiway and the runway. You mean as opposed to doing this in two phases? In two phases, that's correct. And the discussion of that occurs at SCR 577 to 78 and, my apologies, also at SCR 436. There's a complete discussion of why there was a difference between the 2010 EA and why the county withdrew its request that FAA approve that project and instead decided to go back and study the extent of operations at the airport and come forth with a proposal that included lengthening the runway all in one go. This analysis is thorough and reasonable, and the petitioners haven't identified any reason why FAA's decision that all of the alternatives it would study in detail needed to be 5,200 feet. This court should defer to FAA's decision on this point. I would also note just what, to help clarify, the current runway at 4,200 feet is only long enough to serve 75% of all small aircraft that currently operate there, and this distinction between the 4,800 and the 5,200 foot length has to do with what percentage of small aircraft will be accommodated by those lengths. So the 4,800 foot length will only accommodate 95% of all aircraft. The 5,200 foot length will accommodate 100% of all aircraft. FAA's policy is to fund projects that accommodate at least 95% of all aircraft. So at a minimum, it would need to be 4,800 foot, a 4,800 foot runway. And here, again, the county determined that it would make more sense to do a 5,200 foot runway all at once, particularly because this airport is expected to grow over the future. Counsel, could you respond to opposing counsel's concern that the challenger's issue about property values wasn't adequately considered? Yes. I would first note that in the opening brief, the petitioners do not link the consideration of property values with environmental impacts. Well, but they did in their comments. They talked about noise pollution and air pollution and other environmental issues. So just go directly to the question, if you don't mind. Sure. The discussion of the project's impacts on property values is more than sufficient. That discussion occurred at 938 to 939 in the supplemental excerpts. And what FAA did was it looked at the studies that the petitioners provided, and it acknowledged that some of the studies show that noise may negatively impact property values, but other studies that combine noise impacts with proximity to airports showed a net positive effect on property values because the proximity to the airport means that there's easier access to travel and additional employment opportunities. FAA also noted that one of the key studies relied on by the petitioners, the Booz Allen study, itself said that its methodology used in that study should not be used to determine property values at how an airport project would affect property values at other airports because the analysis that needs to be done is so unique to the geographical area and the airport and the project at issue. So with all of this, FAA explained and noted that it would be difficult to draw clear conclusions based on the available information about how the airport expansion would affect property values. But it noted that here the project would, contrary to the current configuration, mean that no houses were in the noise contour. So the project would have the net effect of reducing noise impacts on neighboring residences. And also, FAA noted that developers since the 1930s have been constructed, this airport has been there since the 1930s, and this neighborhood, this area has continued to expand in spite of the fact that the airport is there. And so FAA noted that given these two facts, that the new location would actually reduce noise impacts for residents and the fact that this area is continuing to expand, FAA concluded that there were not going to be significant impacts. This is more than sufficient for FAA to have analyzed the potential impacts on property values. And I would note that the petitioners do not identify any particular flaw with this analysis. FAA did in fact consider the studies that were provided and responded thoroughly. NEPA does not require FAA to have gone out and commissioned specific studies related to this project and its impact on property values. And FAA thoroughly considered the information that was presented to it and responded to those concerns. Unless the court has further questions... I don't believe that we do. I would ask that this court reject the petition for review. Thank you. Thank you, counsel. Your Honors, if I could respond to opposing counsel's argument on property values. There is nothing in the EA proper that discusses property values. What she's referring to is in a response to comments. And when the FAA says that we didn't rebut anything they said, that's because we weren't given the opportunity to. We ask in writing twice for an opportunity to comment on the final environmental assessment, both on this issue and on the issue of these fuel logs that appeared for the first time. And I would like to note that we ask for those fuel logs repeatedly during the administrative process so that we could have them analyzed by an expert. And we subsequently were declined and told they were private property and would not be released to the public. And then they show up in the final EA and we are not given an opportunity to comment. And so I understand that the court, you know, discarded my extra record evidence. I mean, you know, but that was our attempt to make up for a deficiency when they're adding new information as part of their analysis and we don't ever get a chance to comment on it. But going back to the property issue, in their response to comments they state, you know, for example, conscious decisions have been made by the development community to build new homes in proximity to the facility. You know, that's just a bald statement. It doesn't prove that this new expansion isn't going to affect property values. That's not in there. In another paragraph there's a long discussion, and this is in RER at page 193 and 194, there's a long discussion about how these improvements are based on an airport master plan and they're consistent with the forecasting report. Well, that has nothing to do with property values. And so I would encourage the court to take a look at the response to comments and juxtapose that over the NEPA obligation to put the information out, give the public an opportunity to review and critique it. If this all had been said in the draft environmental assessment and we didn't comment on it, then I couldn't stand here and make this argument. But the point is that we did comment as much as we could and nothing was changed in the EA, but now the FAA is coming back and saying, well, we addressed it in the response to comments and they didn't rebut it, and so our position must stand. And I see that I'm out of time, and unless the panel has anything further, I'll be seated. I don't believe that we do. Thank you. We appreciate the arguments of both counsel. They're very helpful, and the case just argued is submitted. We are adjourned for this session.
judges: McKeown, Graber, Christen